HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION and LOCAL 21,
INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION,

                              Plaintiffs,

        v.

MARK S. NELSON, *et al.*,

                              Defendants.

No.  11-cv-5767 RBL

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

[Dkt. #69]

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment [Dkt. #69].  The case ostensibly involves a September 7, 2011, labor protest in Longview, Washington, which involved more than 100 members of the Plaintiff Union.  The protesters were cited for trespassing and other misdemeanors, but were not immediately arrested.  Instead, the individual[1] defendants and their municipal employers made a strategic, policy decision to make the arrests in the following days, when they had the manpower to do so. Eleven arrests were made over the next 11 days.  There have been no arrests since.

---

[1] The individual defendants are Cowlitz County Sheriff Mark Nelson, Longview Police Chief Jim Duscha, Cowlitz County Prosecuting Attorney Susan Baur, and Chief Criminal Deputy Charlie Rosenzweig.  The municipal Defendants are Longview and Cowlitz County.  No party's briefing differentiates among the various Defendants, even when discussing qualified immunity.

The ILWU claims that the delayed arrest policy was retaliatory and designed to discourage its members from lawfully picketing in a labor dispute, in violation of the Union's constitutional rights.  Specifically, it claims that its members' arrests for "perceived crimes" in the days after the September 7 incidents were unlawfully intended to retaliate against the Union and its members for "lawful picketing activities" and to "terrorize them and their supporters into silence . . . (by means of excessive and unwarranted brutal arrest procedures) without due process of law." [Dkt. #1 at ¶ 1].   It argues that these actions support claims[2] under the First Amendment, the Fourteenth Amendment (Due Process and Equal Protection), and the Washington Constitution.

The Defendants argue that the Union does not have standing to assert these claims, and that there is no legal or evidentiary support for any of them.  They ask the Court to so determine as a matter of law.

## I.    Background

The September 7 incident and local law enforcement's reaction to it was part of a much larger and longer lasting dispute.  The underlying dispute is well-known to the Court and to the parties, but a short recitation of the complicated background is required to put the smaller conflict in context.  The dispute in this case can be traced directly back to the 2009 construction of the EGT grain terminal on property leased from the Port of Longview.  The $200 million, state of the art EGT terminal is the first new grain terminal constructed on the West coast in many years.

---

[2] In its Response, the Union voluntarily abandons its claims for (1) violation of its members' Fourth Amendment right to be free from unreasonable search and seizure, (2) unlawful interference in a private labor sector dispute in violation of 42 U.S.C. §151, *et seq.,* and (3) assault, battery and negligence under state law.  [*See* Dkt. #87 at 19-20]

ILWU longshoremen have historically staffed and operated West coast grain terminals, and have historically performed long shore work at the Port of Longview.  In 1999, the ILWU and the Port executed a "Working Agreement" outlining, among other things, the terms and conditions of the Union's "jurisdiction" over long shore work on Port property—including the property that the Port later leased to EGT for construction of its grain terminal.

While the terminal was being built, EGT negotiated with ILWU about using longshoremen to operate the facility.  The Union believed and asserted that it had the contractual and historical right to perform long shore work at the EGT terminal.   It also argued that the Working Agreement specifically prevented the Port from circumventing the Union's jurisdiction by leasing its property to a third party like EGT—an issue that was at the time the subject of a separate lawsuit in this Court.

The parties could not reach agreement, and in July 2011, EGT instead hired a Portland company, General Construction, to run the facility using workers from the unrelated Operating Engineers union.  The ILWU's subsequent efforts to convince EGT that that was not a viable solution ultimately led to violence, vandalism, a second lawsuit, more protests, arrests, and this lawsuit.

By July 2011, the EGT terminal was mostly operational, and General Construction employees were training to operate it.  Trains carrying grain bound for the terminal began arriving, and ILWU members expanded their picketing and protest efforts: they physically blocked trains; blocked and intimidated General Construction employees, and damaged EGT property.

On August 31, 2011, the NLRB sued the ILWU in this Court, and asked for a Temporary Restraining Order.  [*See Ahearn v. ILWU*, Cause No. 11-cv-5684RBL, Dkt. #s 1 and 4].  It

claimed that the ILWU's increasingly violent and destructive protests were unfair labor practices.  The Court heard argument on the TRO the next day.  It determined that the Union had engaged in picket line violence, threats and property damage, mass picketing and blocking ingress and egress.  It also specifically found that there was substantial evidence that "local law enforcement could not control and abate these actions." [Dkt. #28 in Cause No. 11-cv-5684RBL] It expressly enjoined the ILWU from engaging in such practices and set a preliminary injunction hearing for September 8.

But the Union was not dissuaded. On September 7, a train destined for the EGT terminal had 72 of its brake lines cut, and rail cars were uncoupled and damaged. Union members blocked other trains, breached the EGT gate, damaged a door, broke a window, stole a guard's car and drove it into a ditch, threw rocks and wielded pipes.  They threatened General Construction workers and dumped grain from rail cars bound for the EGT terminal, all in direct violation of the TRO.  Local law enforcement issued citations for trespass and other misdemeanors, but could not, and therefore did not, arrest all of the offending protestors at the time. They did have video of the protests and other activities, and were able to identify many of the participants.

The NLRB (joined by EGT, which had intervened) sought an order of contempt.  On September 8, the Court entered a Preliminary Injunction [Dkt #58 in that case] and set a contempt hearing for September 15.  But still the Union was not dissuaded.  By the time *that* hearing was held—replete with live witnesses, photographs and video of the various activities— there was yet another, similar incident[3].  That led to another request for contempt, and another

---

[3] Photographs depicting the protests and the vandalism damage were submitted at what turned out to be weekly hearings in the fall of 2011. Examples are attached as Appendices 1, 2 and 3 to this Order.  The curious reader is invited to review the entire record in the NLRB case.

hearing was scheduled for September 30.  There was another incident of train blocking and vandalism on September 21.

On September 30, the Court found that the Union was in contempt of court, and entered a $250,000 judgment against it for the costs and damages associated with its repeated "picketing" actions in blatant violation[4] of its Orders.

While the Union was not having much success in the NLRB action in this Court, its surrogate, the Port, was faring much better in its simultaneous efforts to impose the Working Agreement on the Lease, and on EGT, in the concurrent litigation over the meaning of those contracts.  *See EGT, L.L.C.  v. Port of Longview*, Cause No. 11 CV 5039 RBL.

EGT was always keenly aware of the Union's Working Agreement with the Port, and of the ILWU's (and the Port's) interpretation of it.  Months before its negotiations with ILWU broke off, EGT sued the Port in this Court, seeking a Declaratory Judgment that the Lease's acknowledgment of the Working Agreement did not impose on EGT any obligation to staff its facility with ILWU workers.  The Port took the position that the Lease incorporated the Working Agreement by reference, reflecting the parties' agreement to defer to it to determine whether ILWU labor was required at the EGT terminal.  The ILWU intervened in that litigation.

The Court heard oral argument on the Port's and EGT's competing Motions for Summary Judgment on this core issue on September 30, 2011, and issued a written Order, largely in the Port's (and the Union's) favor, a week later. [*See* Dkt. #s 27, 42 & 61 in Cause No. 11 CV 5039 RBL].  Shortly thereafter, EGT and the Union worked out an agreement and both the Declaratory Judgment Action and the NLRB action were voluntarily dismissed.

---

[4] A third motion for contempt, based on a more technical violation of the Court's Order, was later noted for October 14.

***

The current case is an offshoot of these events.  The Union claims that local law enforcement violated its First Amendment and other rights by the manner in which they collectively reacted to the Union's ongoing picketing violence and vandalism at EGT and on the railroad lines in the fall of 2011.  The gist of its lawsuit is the claim that the Defendants

> [I]nitiated campaign of harassment, assault and intimidation against the ILWU, its officers and members in an effort to terrorize them and their supporters into silence, to retaliate against their public actions, to improperly support and aid EGT in its labor dispute with ILWU, for personal retribution, and to impose Defendants' own measure of punishment (by means of excessive and unwarranted brutal arrest procedures) for perceived "crimes" without due process of law.

[Dkt. #1 at 2].  The Union initially complained that in arresting them, specifically in the wake of the September 7 incident, the Defendants engaged in "brutal and aggressive public displays of force," and "physically assaulted [Union] members."  The Defendants deny this characterization, but do not dispute that they made some arrests in the days after (rather than during) the September 7 incident.

The Defendants moved to dismiss, and the Court narrowly denied that motion—primarily on the strength of the Union's claims that the arrests were carried out in a brutal, excessive manner. [Dk. # 45] There were, for example, allegations that officers pried open a member's eyes and sprayed mace into them, and that officers arrested a member, took him to his child's school, and did so again, just to embarrass him.  The Plaintiff claimed that these activities were all part of Defendants' policies designed to deprive the Union and its members of their constitutional rights.

The Union's claims were (and are) also based on their claim that, before the excessive and brutal arrests, its members (in large number) sought to peacefully surrender at the Hall of

Justice on September 16. They claim that they showed up and announced, "We are here and we're turning ourselves in.  Come and get us." [Dkt. #87 at 38].

Defendants' Motion for Summary Judgment is based largely on its claim that the evidence in the case does not support the colorful allegations of the Complaint.  They also argue that they[5] are entitled to qualified immunity on the Union's constitutional claims against them. The Union argues primarily that there are questions of fact requiring a trial on its claims.

Even viewed in the light most favorable to the Union, the evidence does not support any of its claims as a matter of law.  For that reason, the Motion for Summary Judgment is GRANTED and the Union's claims are DISMISSED WITH PREJUDICE.

## DISCUSSION.

### A.  Standard of Review.

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Anderson Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party.  *Anderson*, 477 U.S. at 248.  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*. At 251-52.  The moving party

---

[5] Though the briefing does not directly address this point, it is clear that qualified immunity protects only the individual Defendants; it does not apply to the municipalities.  At the same time, there are additional hurdles to bringing a Section 1983 claims against a municipality, which are not discussed in the briefing, but which are addressed below.

bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250.  If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

### B.  Standing.

Defendants' first argument is that the ILWU does not have standing to assert these claims on its own behalf, because its members are not facing a threat of substantial and immediate irreparable injury, and ILWU did not itself suffer an injury.  It argues its members still face the threat of injury because they may still be arrested for their actions on September 7, and that it did suffer an injury itself because it had to redirect resources to respond to the Defendants'' policies and provide bail for its members.

An organization seeking injunctive relief on behalf of its members must show a "likelihood of substantial and immediate irreparable injury" in order to having standing.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).  It may have standing in its own right but must show that "the organization itself has suffered an injury in fact." *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1101 (9th Cir. 2004).  An organization suing on its own behalf can establish an injury when it suffers "both a diversion of its resources and a frustration of its mission." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).  It cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all.

*Id.* It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem. *Id.*

The Defendants' arguments about ILWU's associational or organizational standing to assert these claims are persuasive, especially in light of the undisputed fact that no arrests have been made in connection with the EGT protests since September 18, 2010. Nevertheless, the Court will address the merits of ILWU's various claims.

### C. Claims against Individual Defendants.

The Union asserts related First and Fourteenth Amendment claims against the individual Defendants.

Defendants argue that all of their actions were legitimate law enforcement responses to dangerous and unlawful behavior, and that there is no evidence of hostility or retaliation towards the ILWU or its members. They also argue that they are entitled to qualified immunity on the Union's constitutional claims against them.

### 1. Qualified Immunity.

Qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The Supreme Court has endorsed a two-part test to resolve claims of qualified immunity: a court must decide (1) whether the facts that a plaintiff has alleged "make out a violation of a constitutional right," and (2) whether the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 553 U.S. 223, 232 (2009).[6]

---

[6] In *Pearson*, the Supreme Court reversed its previous mandate from *Saucier,* requiring district courts to decide each question in order. The Court will nevertheless address the substance of the constitutional claims first.

Qualified immunity protects officers not just from liability, but from suit: "it is effectively lost if a case is erroneously permitted to go to trial," and thus, the claim should be resolved "at the earliest possible stage in litigation." *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987).  The purpose of qualified immunity is "to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

Because "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause [to arrest] is present," qualified immunity protects officials "who act in ways they reasonably believe to be lawful." *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011) (quoting *Anderson*, 483 U.S. at 631).  The doctrine "protects all but the plainly incompetent or those that knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335 (1986).

### a.  First Amendment Claim.

The Union's First Amendment claim is based on its allegation that all of the Defendants harbored such hostility toward its members that they collectively implemented policies designed to interfere with the Union members' First Amendment rights of free speech and free assembly. It argues that the arrests were made in retaliation for the Union and its members exercising their First Amendment rights.

The First Amendment forbids government officials from retaliating against individuals for speaking out.  *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (citing *Hartman v. Moore,* 547 U.S. 250, 256, 126 S. Ct. 1695, 164 L.Ed.2d 441 (2006).  To recover under § 1983 for such retaliation, a plaintiff must prove: (1) he engaged in constitutionally protected activity;

(2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action. *Id*.

The Union argues that the September 7 events included lawful, constitutionally-protected picketing, as well as misconduct. It concedes that its members were arrested for (repeatedly) engaging in illegal activity, but argues that that was only because they had participated in legal protesting—in other words, that the lawful picketing, and not the vandalism and trespassing, was the reason for their arrests.

To support its claim that the arrests amounted to unconstitutional retaliation, the Union points out that trespassers are not usually arrested, and argues from that fact that a jury could infer that Defendants' decision to arrest union members must have been retaliatory. Defendants argue that Union members were not arrested because they were legally protesting, but because of their admittedly illegal and dangerous behavior, including trespassing, property destruction, violation of court orders, and the other mischief described above.

The Union also argues that its members were arrested due to animus on the part of the individual defendants, particularly Sheriff Nelson. They claim that absent animus, they would not have been arrested. This claim is based on the fact that Nelson referred to the protesters as "opponents and criminals," and on the fact that Nelson's officers did not arrest the protesters on September 16, when more than 100 Union members and supporters assembled in front of the Hall of Justice and allegedly offered to turn themselves in. At that incident, the Union claims they offered a clear and reasonable alternative to the later arrests, announcing, "We're here and

we're turning ourselves in, come and get us."  The Defendants' failure to do so, the Union claims, is evidence that the subsequent arrests were retaliatory.

Nelson argues that his use of the terms "opponents and criminals" does not demonstrate animus, but instead is an accurate description of the fact that Union members were opposing law enforcement, and that those who violated the law and Court orders on September 7 were "criminals."  With respect to the September 16 offer of arrest, Nelson also argues the officers had no obligation to arrest the members at that time to avoid a constitutional violation.  He argues that (1) no law enforcement agency received advance notice of the event, and the Sheriff's office only learned about it from a media source about 30 minutes before it began; (2) the media had received a press release, but it made no mention of union members turning themselves in or otherwise making themselves available for arrest; and (3), the members were all assembled with family supporters standing by holding signs and local television stations had cameras in place.

The Union's best legal argument is based on *Ford v. City of Yakima*, 706 F.3d 1188 (9th Cir. 2013).  In *Ford*, officers arrested Plaintiff Ford for a noise violation after a traffic stop—not because he was violating the noise ordinance (which he was)—but because he was being disrespectful to the officers.  The Ninth Circuit held that the officers were on notice that they could not arrest Ford in retaliation for his protected speech, even if they otherwise had probable cause for the arrest. The officers were therefore not entitled to qualified immunity.

In this case and in *Ford* the arresting officers had probable cause, but that is where the similarities end.  In *Ford*, there was ample evidence that the officers arrested Ford (only) in retaliation for his protected speech: one officer admitted that he arrested Ford for a violation that would otherwise have resulted only in a citation, because Ford "acted a fool… and we have discretion whether we can book or release you.  *You talked yourself—your mouth and your*

*attitude talked you into jail. Yes, it did.*"  *Ford*, 706 F.3d at 1191 (9th Cir. 2013) (Emphasis in original).

There is no such evidence here, and no similar inferences that can be drawn from the record in this case.  While a plain vanilla "trespass" may not generally result in arrest in Longview or Cowlitz County, that is hardly support for the contention implicit in the Union's argument that its members' repeated mass trespass, violence and vandalism should not have (and would not have) resulted in their arrests, absent their underlying lawful speech.  Taken to its logical extreme, Union's argument is that protesters are immune for arrest, no matter how utterly out of hand the protests are, so long as someone in the crowd is conveying a lawful message.

This position defies common sense, and it certainly finds no support in *Ford*.  The protesters were lawfully arrested for their repeated and escalating unlawful and dangerous behavior.  No case supports the claim that the officers were obligated to arrest them on the spot or not at all.  And they were not obligated to attempt to arrest a large group on the group's terms, when they staged what can charitably be called a media event.

Even viewed in the light most favorable to the Union, these facts do not support its First Amendment claim for retaliation.

Furthermore, and in any event, Nelson and the other individual Defendants are entitled to qualified immunity on this claim.  Even if these facts presented a triable issue on the merits, it is beyond debate that there is no "clearly established" law that officers cannot arrest violent, unlawful trespassers, if doing so might also have the effect of chilling the lawful speech embedded in their actions.  At the very most, the officers made a reasonable mistake about their ability to make arrests after the fact, when the numbers were in their favor.  There is simply no

evidence supporting the contention or the conclusion that any individual defendant was "plainly incompetent" or "knowingly violated the law."

Accordingly, the individual Defendants' Motion for Summary Judgment on the Union's First Amendment claim is GRANTED, and that claim is DISMISSED with prejudice.

### b. 14th Amendment Claims

The Union also claims that the Defendants violated its members' Due Process and Equal Protection rights under the Fourteenth Amendment.  These claims are based on the same factual record as their First Amendment claims.

### 1. Substantive Due Process

The Union claims that the Defendants violated its Fourteenth Amendment substantive due process rights, but it has not shown how this claim is any different than its First Amendment claim, dismissed above.

Generally, substantive due process affords protection for matters relating to marriage, family, procreation, and bodily autonomy.  *Albright v. Oliver*, 510 U.S. 266, 271-72 (1994).  The U.S. Supreme Court has expressly stated that "where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, and not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'"  *Id.* at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

In this case, the First Amendment provides the Union with a textual source of constitutional protection for its actions and its constitutional claims.  Therefore, it cannot seek different substantive due process relief for the same violations, based on the same factual

allegations.  If and to the extent the Union asserts a substantive due process claim, that claim is DISMISSED for the reasons discussed above.

2.  <u>Procedural Due Process</u>

The Union claims that its Fourteenth Amendment procedural due process rights were violated when officers arrested its members in an unnecessarily and intentionally embarrassing manner, rather than simply giving them a citation or summons.  These claims are similar to the First Amendment claims discussed above, except for the "unnecessarily embarrassing" component.

Defendants argue that the evidence demonstrates that the arrests were conducted in a professional manner, and the officers' discretionary choice to perform a custodial arrest does not violate union members' due process rights as a matter of law.

The Supreme Court has held that a custodial arrest for a minor offense is constitutionally permissible—even if the arrest could have been accomplished in a less intrusive manner.  *See, e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557, 149 L. Ed. 2d 549 (2001).  The Union's initial complaint claimed the officers used excessive force and committed state law battery, but those claims have since been abandoned.  The most compelling claims— that the arrests were conducted with brutal, excessive force—are simply unsupported by any evidence.  The claim that the arrests were expressly and impermissibly designed to embarrass the protesters is similarly without factual support.  The "arrest and re-arrest at school" story simply did not happen.

As discussed above, the Union offers no legal support for its claim that it was unconstitutional for officers to arrest its members, and there is no evidence from which a

reasonable jury could conclude its members were deprived of any procedural due process rights. This claim is insufficient as a matter of law.

### 3. Equal Protection

The Union's final, and related, Fourteenth Amendment claim is that Defendants violated its members' equal protection rights because police arrested a number of their members for trespassing when Longview and Cowlitz County officers do not typically arrest trespassers.

In order to establish a claim under the Equal Protection Clause, a plaintiff must demonstrate that (1) she was treated differently from others similarly situated, and (2) the defendant acted with discriminatory intent. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Equal protection "is essentially a direction that all persons similarly situated should be treated alike." *Id.*

The Union claims that the Defendants discriminated against its members by selectively and discriminatorily enforcing the law. It argues that its members should not have been arrested because police officers do not usually charge suspects for second degree, trespass or arrest individuals for off-scene simple misdemeanors.

Defendants argue that the officers felt that arresting and booking the members was the proper approach because of union members' recent behavior and the overall nature of events at the time. They argue that the trespass event on September 7 was not a normal neighborhood trespass dispute but a violent protest, therefore the simple trespasser is not an appropriate comparator for the purpose of the Union's equal protection claim.

Defendants argue, and the record amply demonstrates, that the arrested union members were not your average, one time, innocuous trespassers. They were instead a mass of repeat, violent protesters who violated numerous court orders and intentionally caused significant

property damage.  Any comparison of the officers' arrest of these protesters in the context of the 2010 labor dispute to an average neighborhood trespasser is unwarranted.

The events of September 7 were anything but a simple trespass.  More than 100 angry ILWU members and supporters blocked and vandalized trains and caused other property damage.  There is no evidence that the Union's members were treated differently from other protestors who acted in the same way.  The equal protection claim fails as a matter of law.

Furthermore, and in any event, the individual defendants are entitled to qualified immunity on the Fourteenth Amendment claims.  Any error in their application of the trespass and probable cause law to the situation they faced reflects, at best, a mistake (one that this Court cannot see); not "plain incompetence" or a "knowing  violation" of the law.

The individual Defendants' Motion for Summary Judgment on Plaintiffs' Fourteenth Amendment claims is GRANTED.

**D.  Claims against Municipalities.**

The Union also asserts each of its constitutional claims against the municipal defendants, Longview and Cowlitz County.  It apparently claims that the individual policy makers' decisions became the policy of their respective municipal employers, and that each municipality is liable for its unconstitutional policies.

To set forth a claim against a municipality under 42 U.S.C. § 1983, a plaintiff must show that the defendant's employees or agents acted pursuant to an official custom, pattern, or policy that violates the plaintiff's civil rights; or that the entity ratified the unlawful conduct.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *Larez v. City of Los Angeles*, 946 F.2d 630, 646–47 (9th Cir. 1991). Additionally, a municipality may be liable for a "policy of inaction" where "such inaction amounts to a failure to protect constitutional rights."  *Lee v. City*

*of Los Angeles*, 250 F.3d 668, 682 (9th Cir. 2000) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  Municipal liability for inaction attaches only where the policy amounts to "deliberate indifference."  *Id.*  Thus, a municipality may be liable for inadequate police training when "such inadequate training can justifiably be said to represent municipal policy" and the resulting harm is a "highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."  *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006); *id.* (quoting *Bd. of Cnty. Com'rs*, 520 U.S. at 409).

Accordingly, to impose liability on a local governmental entity for failing to act to preserve constitutional rights, a § 1983 plaintiff must allege that: (1) they were deprived of their constitutional rights by defendants acting under color of state law; (2) the defendants had customs or policies which "amount to deliberate indifference"; and (3) these policies are the "moving force behind constitutional violations.'"  *Lee*, 250 F.3d at 682 (quoting *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)).  But a municipality is not liable simply because it employs a tortfeasor.  *Monell*, 436 U.S. at 691.

The viability of the Union's claims against the municipal defendants is answered by the analysis of the claims against the individual policy makers, discussed above.  The "identify and arrest the protesters later" policy in the context of this large and escalating labor dispute was not unconstitutional as a matter of law.  The Union's First and Fourteenth Amendment *Monell* claims against the municipalities fail as a matter of law.  The Motion for Summary Judgment on these claims is GRANTED, and the claims are DISMISSED with prejudice.

### E.  State Law Claims.

The Union's final remaining claims are the state law versions of the federal constitutional claims rejected above.

1.  **Free Speech and Assembly.**

IWLU claims that Defendants violated its members' right to be free from government retaliation for exercising protected free speech and assembly under the Washington State Constitution.  The Washington State Constitution provides that "[t]he right of petition of the people peaceably to assemble for the common good shall never be abridged." Wash. Const. art. I, § 4. It further provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."  *Id.* § 5.

As discussed above, ILWU has not provided evidence that Defendants retaliated against it or its members for engaging in their free speech and assembly rights.  Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' State Law Free Speech and Assembly claims is GRANTED.

2.  **Equal Protection.**

The Union also asserts a state law (Washington State Constitution art. I, § 12) equal protection claim, but its Response does not explain the basis for this claim, and does not differentiate it from its federal Fourteenth Amendment claim.   For the reasons discussed above, this claim is insufficient as a matter of law. Defendants' Motion for Summary Judgment on Plaintiffs' State Law Equal Protection claim is GRANTED.

**Conclusion**

Plaintiffs' claims are insufficient as a matter of law, and they are DISMISSED with prejudice. The clerk shall enter a judgment in the defendants' favor, and, consistent with the Court's oral ruling on this matter, the Plaintiff's appellate rights shall commence at the effective date of that judgment.

IT IS SO ORDERED.

Dated this 11th day of April, 2013.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

# APPENDIX
# 1



# APPENDIX 2



# APPENDIX 3

